Classic Coffee Concepts, Inc. v. Anderson, 2006 NCBC 21

NORTH CAROLINA

COUNTY OF MECKLENBURG

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
06 CVS 2941

CLASSIC COFFEE CONCEPTS, INC.,

Plaintiff,

v.

J. MICHAEL ANDERSON,

Defendant.

**ORDER**

*Mayer, Brown, Rowe & Maw, L.L.P. by Eric H. Cottrell and Daniel L. Tedrick for Plaintiff Classic Coffee Concepts, Inc.*

*McNair Law Firm, P.A. by Marna M. Albanese and Allan W. Singer for Defendant J. Michael Anderson.*

Diaz, Judge.

{1}     The Court heard these matters on 6 September 2006 on Motion of Defendant J. Michael Anderson ("Anderson") to Disqualify and Motion of Plaintiff Classic Coffee Concepts, Inc. ("Classic Coffee") to Dismiss Counterclaims.  For the reasons set forth below, and after considering the Court file,[1] the Motions, the briefs, and the arguments of counsel, the Court **DENIES** the Motion to Disqualify and **GRANTS** the Motion to Dismiss Counterclaims.

**I.**

**PROCEDURAL BACKGROUND**

{2}     Classic Coffee filed its Complaint ("Compl.") in Mecklenburg County Superior Court on 13 February 2006.

---

[1] The Court considered the Court file, but only as to the Motion to Disqualify.

{3}     Anderson filed his Motion to Disqualify Counsel ("Mot. to Disqualify") and his Answer and Counterclaims ("Answer and Countercls.") on 24 April 2006.

{4}     The case was transferred to the North Carolina Business Court and assigned to me as a mandatory complex business case by order of the Chief Justice of the North Carolina Supreme Court dated 12 May 2006.

{5}     On 22 June 2006, Classic Coffee filed its Reply to Anderson's Counterclaims ("Reply to Countercls."), Motion to Dismiss Counterclaims for Unconscionability and Judicial Dissolution ("Mot. to Dismiss Countercls."), and its Memorandum of Law in Support of Motion to Dismiss Counterclaims ("Mem. in Supp. of Mot. to Dismiss Countercls.").

{6}     Anderson filed his Memorandum of Law in Support of Motion to Disqualify Counsel ("Mem. in Supp. of Mot. to Disqualify") on 23 June 2006.

{7}     On 11 July 2006, Classic Coffee filed its Response to Motion to Disqualify Counsel ("Resp. to Mot. to Disqualify").

{8}     On 12 July 2006, Anderson filed his Response to Plaintiff's Memorandum in Support of Motion to Dismiss ("Resp. to Mot. to Dismiss").

{9}      Classic Coffee filed its Reply Memorandum in Support of Motion to Dismiss Counterclaims ("Reply Mem. in Supp. of Mot. to Dismiss Countercls") on 24 July 2006.

{10}    On 6 September 2006, the Court heard oral arguments on the Motions.

## II.

## FACTUAL BACKGROUND

## A.

## THE PARTIES

2

{11}    Plaintiff Classic Coffee is a closely-held Delaware corporation with its principal place of business in Mecklenburg County, North Carolina.  (Compl. ¶ 1; Answer and Countercls. ¶ 1.) Classic Coffee was formerly known as Mr. Coffee Concepts, Inc., and changed its name to Classic Coffee Concepts, Inc., on 26 April 2002.  (Compl. ¶ 1.)  Classic Coffee sells commercial coffee makers, accessories, coffee, and related coffee products to office cataloguers, the hospitality market, and small businesses, both domestically and internationally.  (Compl. ¶ 4.)

{12}    Defendant Anderson is a citizen and resident of Statesville, North Carolina.  (Compl. ¶ 2.)  Anderson was formerly employed by Classic Coffee as its Chief Financial Officer.  (Compl. ¶ 6.)  Anderson owns 15,000 of Classic Coffee's 45,000 issued and outstanding shares of common stock.  (Compl. ¶ 5; Answer and Countercls. ¶ 30; Reply to Countercls. ¶ 30.)

**B.**

**OVERVIEW OF THE FACTS[2]**

{13}    On 5 December 2000, Anderson, Rox W. Bailey ("Bailey"), Paul F. Brinson ("Brinson"), and Classic Coffee entered into a Stockholders Agreement.  (Compl. Ex. A.)

{14}    The Stockholders Agreement provides that it "shall be governed by and construed in accordance with the laws of the State of North Carolina, without giving effect to principles of conflicts of law."  (Compl. Ex. A.¶ 5.6.)

{15}    On or about the execution of the Stockholders Agreement, Anderson entered into a Continuing and Unconditional Guaranty Agreement ("Guaranty Agreement") with Bank of America, N.A. (the "Bank"), (Resp. to Mot. to Disqualify Ex. A), and an Employment Agreement with Classic Coffee, (Mem. in Supp. of Mot. to Disqualify Ex. D).  Like the Stockholders Agreement, the Employment Agreement contains a North Carolina choice of law provision.  (Mem. in Supp. of Mot. to Disqualify Ex. D. ¶ 3.7.)

---

[2] The Court makes findings of fact solely for the purpose of resolving the Motion to Disqualify.

3

{16} The Employment Agreement provided Anderson a 12-month term of employment that could be extended automatically for additional 12-month terms, unless sooner terminated. (Mem. in Supp. of Mot. to Disqualify Ex. D ¶ 1.3.) Under the terms of the Employment Agreement, Classic Coffee could terminate Anderson either "with Cause" or "without Cause," (Mem. in Supp. of Mot. to Disqualify Ex. D ¶ 1.5(b)), subject to the payment of a specified severance, (Mem. in Supp. of Mot. to Disqualify Ex. D ¶ 1.6(e)).

{17} On 22 July 2003, Anderson's employment with Classic Coffee was terminated "without Cause." (Answer and Countercls. ¶ 39.)

{18} Pursuant to paragraph 3.1(b) of the Stockholders Agreement, "[i]n the event that a Stockholder's employment with [Classic Coffee] is terminated . . . without Cause, [Classic Coffee is] obligated to purchase from such Stockholder, and each Stockholder [is bound] to sell to [Classic Coffee], all of the Stock owned by such Stockholder." (Compl. Ex. A ¶ 3.1(b).)

{19} The Stockholders Agreement further provides that the "price per share at which the Stock of the Stockholder shall be purchased and sold pursuant to Section 3.1(b) shall be equal to the quotient of the 'fair market value' of [Classic Coffee] divided by the total number of shares . . . issued and outstanding." (Compl. Ex. A ¶ 3.2(a).) Further, the Stockholders Agreement defines Classic Coffee's "fair market value" as the difference between the fair market value of the company, as determined by the independent appraisal of the Employee Stock Ownership Plan and Trust ("ESOP"), and the aggregate liquidation preference of any preferred stock issued and outstanding on the date of the termination of the stockholder's employment. (Compl. Ex. A ¶ 3.2(b).) Finally, where a stockholder's employment is terminated "without Cause," the Stockholders Agreement provides that "the 'fair market value' of [Classic Coffee] shall be

4

redetermined annually on the anniversary date of [the] Stockholder's termination" until the stockholder is paid in full for his stock. (Compl. Ex. A ¶¶ 3.2(b), 3.3(b).)

{20} Under paragraph 3.4 of the Stockholders Agreement, "[t]he closing of any purchase and sale . . . [was to be] be consummated . . . within sixty (60) days following . . . the termination of the Stockholder's employment with [Classic Coffee]." (Compl. Ex. A ¶ 3.4.)

{21} Pursuant to the Guaranty Agreement, however, Anderson's Classic Coffee stock was pledged to the Bank as collateral in support of his personal guarantee of Classic Coffee's loan agreements with the Bank. (Answer and Countercls. ¶ 52; Reply to Countercls. ¶ 52.)

{22} The termination of Anderson's employment with Classic Coffee did not discharge his obligations under the Guaranty Agreement. (Resp. to Mot. to Disqualify Ex. A ¶ 7.)

{23} Shortly after the termination of Anderson's employment, Classic Coffee asked the Bank to release Anderson's stock. (Compl. ¶ 13.) However, Classic Coffee owed a substantial amount of money to the Bank at that time, and the Bank refused to release the stock. (Compl. ¶ 13.)

{24} As a result, Classic Coffee could not purchase Anderson's stock within sixty days of the termination of Anderson's employment. (Compl. Ex. B; Answer and Countercls. ¶ 44; Reply to Countercls. ¶ 44.)

{25} Classic Coffee satisfied its loan obligations to the Bank by 1 December 2005. (Reply to Countercls. ¶ 56.) In the process of refinancing Classic Coffee's credit facility, the Bank agreed to release Anderson's stock. (Compl. Ex. B.)

{26} On 14 December 2005, Classic Coffee wrote to Anderson informing him that it would "proceed with the mandatory redemption of [Anderson's] stock as required by the Stockholders Agreement." (Compl. Ex. B.) The letter, which was enclosed with copies of documents setting

5

forth the terms and conditions of the proposed transaction, set a purchase price of $192,000 and a closing date of 30 December 2005.  (Compl. Ex. B.)

{27}    Anderson has not sold his stock to Classic Coffee.  (Compl. ¶ 17.)

{28}    Classic Coffee alleges that Anderson is in breach of the Stockholders Agreement, (Compl. ¶¶ 19-25), and seeks "specific performance of [Anderson's] obligation under the Stockholders Agreement to sell the Shares to [Classic Coffee] . . . pursuant to the terms of the Closing Documents . . . ." (Compl. Prayer ¶¶ 1-2).

{29}    Anderson alleges that Classic Coffee's valuation grossly undervalues his stock.  (Answer and Countercls. ¶ 59.)  Anderson also alleges that Classic Coffee is in breach of both the Stockholders Agreement and his Employment Agreement.  (Answer & Countercls. ¶¶ 63, 69.)  Anderson seeks to have the sections of the Stockholders Agreement that relate to the transfer of stock declared unenforceable on the grounds that they are unconscionable.  (Answer and Countercls. ¶¶ 65-67; Answer and Countercls. Prayer ¶ 2.)  Anderson also seeks judicial dissolution of Classic Coffee, (Answer and Countercls. ¶¶ 71-75), and damages arising out of the alleged breaches of the Stockholders Agreement and his Employment Agreement, (Answer and Countercls. ¶¶ 62-64, 68-70).

{30}    The law firm of Mayer, Brown, Rowe & Maw ("MBR&M") represents Classic Coffee in this action.

{31}    Jonathan Barrett ("Barrett"), who is currently a partner at MBR&M, began representing Classic Coffee in 1992 as corporate counsel.  (Barrett Dep. 6:4-21.)  There is no evidence that Barrett or MBR&M represented Anderson in matters arising prior to their representation of Classic Coffee.  (Barrett Dep. 6:5-25.)

6

{32} Barrett represented Classic Coffee with respect to the Stockholders Agreement and the employment agreements between Classic Coffee and Anderson, Bailey, and Brinson. (Barrett Dep. 31:21-35; Bailey Aff. ¶¶ 10, 14, 16-17; Brinson Aff. ¶¶ 7, 11, 13-14.)

{33} Anderson was not represented by separate counsel when Classic Coffee was created. (Bailey Aff. ¶ 12; Brinson Aff. ¶ 9.)

{34} During negotiation of the Stockholders Agreement and Anderson's Employment Agreement, Barrett advised Anderson, Bailey, and Brinson that they were free to seek outside counsel to advise them in their individual capacity. (Barrett Dep. 31:21-32:2; Bailey Aff. ¶ 11; Brinson Aff. ¶ 8.)

{35} When Anderson and Brinson sought Barrett's advice on the effect of designating Bailey as Chairman of Classic Coffee's Board, Barrett's response was directed to both Anderson and Brinson. (Anderson Dep. 31:15-32:9.)

{36} MBR&M acted as special counsel to Anderson, Bailey, and Brinson in their capacities as guarantors under the Guaranty Agreement. (Mem. in Supp. of Mot. to Disqualify Ex. E; Resp. to Mot. to Disqualify 2 n.1.) There is no evidence that Barrett or MBR&M actually represented Anderson in any matters other than the Guaranty Agreement. (Barrett Dep. 31:1-34:11.)

{37} The only information that MBR&M received from Anderson during its representation of him was a certification that he was not aware of any violations of existing laws and regulations that could "materially adversely affect [Classic Coffee] or his ability to fill [sic] his obligations under the [Guaranty Agreement]," and a certification that Anderson was not involved in any pending or threatened lawsuits, investigations, or proceedings. (Barrett Dep. 23:4-24:23.)

{38} During his employment, Anderson never entered into a written engagement for legal representation with Barrett or MBR&M. (Anderson Dep. 23:22-24:5.) He never received an

invoice from or made any payment to Barrett or MBR&M, (Anderson Dep. 24:6-26:10), and MBR&M's services were billed to and paid for by Classic Coffee exclusively, (Anderson Dep. 24:16-26:10).

{39}   Whenever Barrett discussed Anderson's Employment Agreement with him, Barrett informed Anderson that he represented Classic Coffee exclusively.  (Barrett Dep. 32:10-34:11.) Barrett never advised Anderson that he was acting on his behalf or that he did not need to seek separate counsel.  (Anderson Dep. 50:7-13.)

{40}   Anderson never informed Barrett that he considered him to be his personal attorney, (Anderson Dep. 26:11-14; Barrett Dep. 32:3-6), and Anderson never stated to any third party that he considered Barrett to be his personal attorney.  (Anderson Dep. 26:15-18.)

## III.

## CONCLUSIONS OF LAW

## A.

## MOTION TO DISQUALIFY

{41}   Anderson's Memorandum of Law in Support of Motion to Disqualify Counsel makes three arguments for disqualifying MBR&M.  First, Anderson argues that MBR&M should be disqualified under North Carolina Revised Rule of Professional Conduct 1.9 ("Rule 1.9") because it represented him with regard to the Guaranty Agreement.  Second, Anderson argues that MBR&M should be disqualified because it represents Classic Coffee, a closely-held corporation, and Anderson, as a stockholder and director of the closely-held corporation, reasonably believed that MBR&M represented both parties with regard to the Stockholders Agreement and his Employment Agreement.  Third, Anderson argues that MBR&M should be

8

disqualified because it is corporate counsel for Classic Coffee, a closely-held corporation, and therefore has "responsibilities" to Anderson, one of Classic Coffee's stockholders and directors.

{42}     The Court addresses each of these arguments in turn.

## 1.

## GUARANTY AGREEMENT

{43}     Anderson first argues that MBR&M should be disqualified under Rule 1.9 because it represented him with regard to the Guaranty Agreement.  (Mem. in Supp. of Mot. to Disqualify 5-7.)  The Court disagrees.

{44}     Under North Carolina Revised Rule of Professional Conduct 1.9, a "lawyer who has formerly represented a client in a matter shall not thereafter represent another person *in the same or a substantially related matter* in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing."  N.C. Rules of Prof'l Conduct R. 1.9 (2006) (emphasis added).

{45}     Matters are "substantially related" for purposes of Rule 1.9 "if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter."  N.C. Rules of Prof'l Conduct R. 1.9 cmt. 3 (2006). Furthermore, "[t]he 'substantially related' test requires a 'virtual congruence of issues,' and the relationship between the issues in the prior [representation] must be 'patently clear.'" *Plant Genetic Sys. v. Ciba Seeds*, 933 F. Supp. 514, 518 (M.D.N.C. 1996) (quoting *U.S. Football League v. Nat'l Football League*, 605 F. Supp. 1148, 1457 (S.D.N.Y. 1985)).

9

{46} It is undisputed that MBR&M acted as special counsel to Anderson with regard to the Guaranty Agreement. (Mem. in Supp. of Mot. to Disqualify Ex. E; Resp. to Mot. to Disqualify 2 n.1.)

{47} However, this representation is not substantially related to the claims before the Court because: (a) the Guaranty Agreement is separate from the transactions that give rise to the claims in this case; and (b) MBR&M did not obtain any information during its representation that would materially advance Classic Coffee's position here.

{48} The Guaranty Agreement is separate from the transactions that give rise to the claims in this case for two reasons: (a) neither Anderson nor Classic Coffee have alleged any cause of action arising out of the Guaranty Agreement; and (b) the Guaranty Agreement, the Stockholders Agreement, and Anderson's Employment Agreement are separate and distinct transactions between different parties and concerning different subject matters.

{49} Classic Coffee's claim for breach of contract arises exclusively out of the Stockholders Agreement, (Compl. ¶¶ 19-25), and none of Anderson's four counterclaims arise out of the Guaranty Agreement, (Answer and Countercls. ¶¶ 62-75). Anderson's reference, in paragraphs 60 and 61 of his Answer and Counterclaims, to the Guaranty Agreement as a source of irritation does not state a claim and is an insufficient basis for disqualifying MBR&M.

{50} Furthermore, the Guaranty Agreement, the Stockholders Agreement, and Anderson's Employment Agreement are separate and distinct transactions between different parties and concerning different subject matters. The Guaranty Agreement is between Anderson and the Bank and obligates Anderson as a guarantor of the Bank's loan to Classic Coffee. (Resp. to Mot. to Disqualify Ex. A.) The Stockholders Agreement, on the other hand, is between Classic Coffee and its stockholders and governs the parties' ability to buy, sell, and vote Classic Coffee stock.

10

(Compl. Ex. A.) Finally, Anderson's Employment Agreement is between Anderson and Classic Coffee, exclusively, and dictates the terms of Anderson's employment. (Mem. in Supp. of Mot. to Disqualify Ex. D.)

{51} To press his claim for disqualification, Anderson emphasizes that: (a) the agreements were prepared, reviewed, and executed on or about the same time; (b) the Stockholders Agreement makes reference to the Guaranty Agreement; and (c) Classic Coffee could not purchase Anderson's stock immediately after the termination of his employment because the stock was pledged to the Bank as security for the Guaranty Agreement. These facts, however, prove only that the Guaranty Agreement is, at most, tangentially related to the claims in this case and, like Anderson's references to the Guaranty Agreement in paragraphs 60 and 61 of his Answer and Counterclaims, are insufficient bases for disqualifying MBR&M.

{52} Further, there is no evidence that MBR&M obtained any information during its limited representation of Anderson that would materially advance Classic Coffee's position in this case.

{53} The only information that MBR&M received from Anderson during its representation of him was a certification that he was not aware of any violations of existing laws and regulations that could "materially adversely affect [Classic Coffee] or his ability to fill [sic] his obligations under the [Guaranty Agreement]," and a certification that Anderson was not involved in any pending or threatened lawsuits, investigations, or proceedings. (Barrett Dep. 23:4-24:23.)

{54} This information is unrelated to any of the claims before the Court and, therefore, is an insufficient basis for disqualifying MBR&M.

{55} In sum, MBR&M's representation of Anderson with regard to the Guaranty Agreement is not substantially related to the claims in this case because: (a) the Guaranty Agreement is separate from the transactions that give rise to the claims; and (b) MBR&M did not obtain any

11

information during its representation that would materially advance Classic Coffee's position in this case. Accordingly, the Court declines to disqualify MBR&M on this ground.

**2.**

**STOCKHOLDERS AND EMPLOYMENT AGREEMENTS**

{56} Anderson next argues that MBR&M should be disqualified under Rule 1.9 because it represents Classic Coffee, a closely-held corporation, and Anderson, as a stockholder and director of the closely-held corporation, reasonably believed that MBR&M represented both parties with regard to the Stockholders Agreement and his Employment Agreement. (Mem. in Supp. of Mot. to Disqualify 6-7.) The Court again disagrees.

{57} An attorney retained by an organization represents the organization acting through its duly authorized constituents, and "does not, by virtue of that representation, *necessarily* represent any constituent . . . ." N.C. Rules of Prof'l Conduct R. 1.7 cmt. 34 (2006) (emphasis added).

{58} Whether an attorney for an organization also represents a constituent is a question of fact for the trial court. *See Flick Mortgage Investors, Inc. v. The Epiphany Mortgage*, 2006 NCBC 3, at ¶ 14 (N.C. Super. Feb. 1, 2006). "The question is whether the parties' conduct 'was such that an attorney-client relationship could reasonably be inferred.'" *Id.* (quoting *Ferguson v. DDP Pharmacy, Inc.*, 174 N.C. App. 532, 537, 621 S.E.2d 323, 327 (2005)).

{59} "The goal of maintaining public confidence in our system of justice demands that courts prevent the appearance of impropriety and thus resolve any and all doubts in favor of disqualification." *Chemcraft Holdings Corp. v. Shayban*, 2006 NCBC 13, at ¶ 34 (N.C. Super. Oct. 5, 2006). "In preventing the appearance of impropriety, the client's perception of events is of paramount importance and overshadows the details of his attorney's conduct." *Id.* While the

12

client's perception of a conflict must be reasonable, "[t]he conduct of an attorney need not constitute a violation of the Rules of Professional Conduct, and certainly need not rise to the level of professional negligence in order to warrant disqualification." *Id.*

{60} The Court's ultimate factual inquiry here is whether Anderson, as a stockholder and director of Classic Coffee, had a reasonable belief that MBR&M represented him with regard to the Stockholders Agreement and his Employment Agreement.

{61} Determining the reasonableness of a constituent's belief that he was personally represented by the organization's attorney is particularly difficult and fact-intensive in the context of a closely-held corporation. *E.g., United States v. Edwards*, 39 F. Supp. 2d 716, 731-32 (M.D. La. 1999) ("The issue of attorney-client relationship becomes more complicated in the case of a small closely-held corporation with only a few shareholders or directors. In such cases, the line between individual and corporate representation can become blurred . . . the determination whether the attorney represented the individual of the small closely-held corporation is fact-intensive and must be considered on a case-by-case basis"); *Bobbitt v. Victorian House, Inc.*, 545 F. Supp. 1124, 1126 (N.D. Ill. 1982) ("Analysis is somewhat more complex as to a small close corporation with only a few shareholders and directors. There it may be more difficult to draw the line between individual and corporate representation . . . the question must be determined on the individual facts of each case."); *see also First Republic Bank v. Brand*, 51 Pa. D. & C.4th 167, 177-79 (2001) (reviewing cases that have addressed the issue of whether an attorney for a closely-held corporation also represents the closely-held corporation's stockholders).

{62} Although it does not appear that North Carolina courts have addressed the issue, other jurisdictions have developed varied tests for determining whether a closely-held corporation's

13

attorney has entered into an attorney-client relationship with the corporation's constituent.[3] Of these, the Court finds the test articulated in *First Republic Bank v. Brand* to be the most comprehensive.

{63} In *First Republic Bank*, the court outlined several factors for determining whether a corporation's attorney had entered into an attorney-client relationship with the corporation's stockholder. 51 Pa. D. & C.4th at 184-85. These factors include: (1) whether the stockholder was separately represented by other counsel when the corporation was created or in connection with its affairs; (2) whether the stockholder sought advice on and whether the attorney represented the stockholder in particularized or individual matters, including matters arising prior to the attorney's representation of the corporation; (3) whether the attorney had access to the stockholder's confidential or secret information that was unavailable to other parties; (4) whether the attorney's services were billed to and paid by the corporation or the stockholder; (5) whether the corporation is closely held; (6) whether the stockholder could reasonably have believed that the attorney was acting as his individual attorney rather than as the corporation's attorney; (7) whether the attorney affirmatively assumed a duty of representation to the stockholder by either express agreement or implication; (8) whether the matters on which the attorney gave advice are within his or her professional competence; (9) whether the attorney entered into a fee arrangement; and (10) whether there was evidence of reliance by the stockholder on the attorney as his or her separate counsel or of the stockholder's expectation of personal representation.[4] *Id.*

---

[3] *E.g., Sackley v. Se. Energy Group, Ltd.*, 1987 U.S. Dist. LEXIS 10279, at *9-10 (N.D. Ill. June 22, 1987); *compare* ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 361 (1991) *with Hopper v. Frank*, 16 F.3d 92, 96 (5th Cir. 1994) *and Meyer v. Mulligan*, 889 P.2d 509, 514 (Wyo. 1995).

[4] Of the ten factors outlined in *First Republic Bank*, it is unnecessary for the Court to separately explore the sixth factor, whether the constituent could reasonably have believed that the attorney was acting as his individual attorney, because, in ruling on a motion to disqualify, "the client's perception of events is of paramount importance," *Chemcraft*, 2006 NCBC 13, at ¶34, and, thus, the sixth factor of the test merely restates the Court's ultimate inquiry. A review of the other nine factors reveals, however, that they all bear on the issue of the reasonableness of the constituent's belief and, therefore, inform the Court's ultimate inquiry.

14

{64}   It is uncontested that Classic Coffee is a closely-held corporation, (Compl. ¶ 5; Answer and Countercls. ¶ 30; Reply to Countercls. ¶ 30), and that Anderson was not represented by separate counsel when it was created or in connection with its affairs, (Bailey Aff. ¶ 12; Brinson Aff. ¶ 9).  Furthermore, it is uncontested that MBR&M affirmatively assumed a duty of representation to Anderson in his capacity as a guarantor under the Guaranty Agreement.  (Mem. in Supp. of Mot. to Disqualify Ex. E; Resp. to Mot. to Disqualify 2 n.1.)

{65}   However, these three facts do not justify finding that Anderson had a reasonable belief that he was represented by MBR&M with regard to the Stockholders Agreement or his Employment Agreement in light of the other factors weighing against such a finding.

{66}   First, there is no evidence that Barrett or MBR&M actually represented Anderson in any matters other than the Guaranty Agreement, (Barrett Dep. 31:1-34:11), and there is no evidence that Barrett or MBR&M represented Anderson in matters arising prior to its representation of Classic Coffee, (Barrett Dep. 6:5-25).

{67}   Second, there is no evidence that MBR&M had access to Anderson's confidential or secret information.  As noted earlier, the only personal information MBR&M received from Anderson was a certification that he was not aware of any violations of existing laws and regulations that could "materially adversely affect [Classic Coffee] or his ability to fill [sic] his obligations under the [Guaranty Agreement]," and a certification that Anderson was not involved in any pending or threatened lawsuits, investigations, or proceedings.  (Barrett Dep. 23:4-24:23.) This information is unrelated to any of the claims in this case and was shared with the Bank, Bailey, and Brinson.  (*See* Mem. in Supp. of Mot. to Disqualify Ex. E ¶ 7, 9.)  Consequently, it is unlikely that Anderson considered it to be either confidential or secret.

15

{68} Third, Anderson never entered into a written engagement for legal representation with Barrett or MBR&M. (Anderson Dep. 23:22-24:5.) He never received an invoice from or made any payment to Barrett or MBR&M, (Anderson Dep. 24:6-26:10), and MBR&M's services were billed to and paid for by Classic Coffee exclusively, (Anderson Dep. 24:16-26:10).

{69} Fourth, MBR&M never assumed a duty of representation to Anderson by either express agreement or implication outside of the context of the Guaranty Agreement. To the contrary, during negotiation of the Stockholders Agreement and Anderson's Employment Agreement, Barrett advised Anderson, Bailey, and Brinson that they were free to seek outside counsel to advise them in their individual capacity. (Barrett Dep. 31:21-32:2; Bailey Aff. ¶ 11; Brinson Aff. ¶ 8.) Whenever Barrett discussed Anderson's Employment Agreement with him, Barrett informed Anderson that he represented Classic Coffee exclusively. (Barrett Dep. 32:10-34:11.) When Anderson and Brinson sought Barrett's advice on the effect of designating Bailey as Chairman of Classic Coffee's Board, Barrett's response, consistent with the role of corporate counsel, was directed to both Anderson and Brinson. (Anderson Dep. 31:15-32:9.) Further, Barrett never advised Anderson that he was acting on his behalf or that he did not need to seek separate counsel. (Anderson Dep. 50:7-13.)

{70} Fifth, there is no evidence that MBR&M, outside of the context of the Guaranty Agreement, gave Anderson personal advice on any matters within its professional competence.

{71} Finally, Anderson never informed Barrett that he considered him to be his personal attorney, (Anderson Dep. 26:11-14; Barrett Dep. 32:3-6), and Anderson never stated to any third party that he considered Barrett to be his personal attorney, (Anderson Dep. 26:15-18). Thus, other than Anderson's conclusory statements regarding his belief that MBR&M represented him with respect to the Stockholders Agreement and the Employment Agreement,

16

there is no objective evidence of either reliance by Anderson on MBR&M as his separate

counsel or an expectation of personal representation.

{72}   In sum, an examination of the facts of this case reveals that Anderson, regardless of his

status as a stockholder and director of Classic Coffee, did not have a reasonable belief that he

was represented by MBR&M with regard to Stockholders Agreement and his Employment

Agreement.  Consequently, there is no basis for disqualifying MBR&M from representing

Classic Coffee in this action under North Carolina Revised Rule of Professional Conduct 1.9.

**3.**

**CLOSELY-HELD CORPORATION**

{73}   Finally, Anderson argues that that MBR&M should be disqualified under North Carolina

Revised Rule of Professional Conduct 1.7[5] because it is corporate counsel for Classic Coffee, a

closely-held corporation, and therefore has "responsibilities" to Anderson, one of Classic

Coffee's stockholders and directors.[6]  (Mem. in Supp. of Mot. to Disqualify 7-9.)  The Court

again disagrees.

{74}   Under North Carolina Revised Rule of Professional Conduct 1.13(a), a "lawyer employed

or retained by an organization *represents the organization* acting through its duly authorized

constituents."  N.C. Rules of Prof'l Conduct R. 1.13(a) (2006) (emphasis added).  Further, as

noted earlier, a "lawyer who represents a corporation or other organization does not, by virtue of

---

[5] North Carolina Revised Rule of Professional Conduct 1.7 provides that:
> A lawyer shall not represent a client if the representation involves a concurrent conflict of interest.
> A concurrent conflict of interest exists if:
>> (1) the representation of one client will be directly adverse to another client; or
>> (2) the representation of one or more clients may be materially limited by the lawyer's responsibilities to another client, a former client, or a third person, or by a personal interest of the lawyer.

N.C. Rules of Prof'l Conduct R. 1.7 (2006).

[6] Anderson does not argue that he is a current client of MBR&M, only that MBR&M, as corporate counsel for Classic Coffee, has "responsibilities" to him as one of Classic Coffee's stockholders and directors.

17

that representation, necessarily represent any constituent." N.C. Rules of Prof'l Conduct R. 1.7 cmt. 34 (2006).

{75}   In addition, Comment 10 to North Carolina Revised Rule of Professional Conduct 1.13 states that:

> There are times when the organization's interest may be or become adverse to those of one or more of its constituents. In such circumstances the lawyer should advise any constituent, whose interest the lawyer finds adverse to that of the organization of the conflict or potential conflict of interest, that the lawyer cannot represent such constituent, and that such person may wish to obtain independent representation.

N.C. Rules of Prof'l Conduct R. 1.13 cmt. 10 (2006).

{76}   These rules, in combination, clearly contemplate representation of a corporation by corporate counsel in situations where the corporation's interests are adverse to one of its constituents. Furthermore, they make no exception for closely-held corporations like Classic Coffee. Since the North Carolina Revised Rules of Professional Conduct do not establish a *per se* rule against corporate counsel representing a closely-held corporation against one of its stockholders or directors, the Court declines to create such a rule here.

{77}   Furthermore, Anderson, as discussed earlier, did not have a reasonable belief that he, as a stockholder and director of Classic Coffee, was represented by MBR&M during his employment. He certainly has no such belief now. (*See* Anderson Depo. 85:5-87:24.)

{78}   Since there is no *per se* rule against corporate counsel representing a closely-held corporation against one of its stockholders or directors, and since Anderson concedes that he is not now represented by MBR&M, Anderson's status as a stockholder and director of MBR&M's client, Classic Coffee, is an insufficient basis to disqualify MBR&M from representing Classic Coffee in this case.

18

{79}    Accordingly, since there is no basis for disqualifying MBR&M from representing Classic Coffee in this case, the Court **DENIES** Anderson's Motion to Disqualify.

**B.**

**MOTION TO DISMISS COUNTERCLAIMS**

{80}    Classic Coffee has moved to dismiss the Second Cause of Action (Unconscionability) and Fourth Cause of Action (Judicial Dissolution) contained in Anderson's Answer and Counterclaims pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure.  (Mot. to Dismiss Countercls.)

{81}    The essential question on a Rule 12(b)(6) motion to dismiss is "'whether the complaint, when liberally construed, states a claim upon which relief can be granted on *any* theory.'" *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 56, 554 S.E.2d 840, 844 (2001) (quoting *Barnaby v. Boardman*, 70 N.C. App. 299, 302, 318 S.E.2d 907, 909 (1984)) (emphasis in original).

{82}    While the complaint's material factual allegations are taken as true on a motion to dismiss pursuant to Rule 12(b)(6), *id.* (citing *Hyde v. Abbot Labs.*, 123 N.C. App. 572, 575, 473 S.E.2d 680-82 (1996)), the Court is not required to accept as true "any conclusions of law or unwarranted deductions of fact."  *Id.* (citing *Sutton v. Duke*, 277 N.C. 94, 98, 176 S.E.2d 161, 163 (1970)).

{83}    "When the complaint fails to allege the substantive elements of some legally cognizable claim, or where it alleges facts which defeat any claim, the complaint must be dismissed [under Rule 12(b)(6)]."  *Id.* (citing *Hudson Cole Dev. Corp. v. Beemer*, 132 N.C. App. 341, 345-46, 511 S.E.2d 309, 312 (1999)).

19

# 1.

## UNCONSCIONABILITY

{84}    Anderson's Answer and Counterclaims alleges that Anderson should not be required to sell his Classic Coffee stock pursuant to the terms of the Stockholders Agreement because "there has been a change in circumstances since the [execution of] the Stockholders Agreement which renders the enforcement of the Stockholders Agreement unconscionable."  (Answer and Countercls. ¶ 66.)

{85}    Before turning to the merits of the motion, the Court notes that resolution of this claim presents a difficult choice of law issue that was not briefed by the parties.  Anderson's claim of unconscionability is an attack on the enforceability of the Stockholders Agreement, (*see* Answer and Countercls. ¶¶ 65-67), and the parties agreed that North Carolina substantive law would govern any disputes arising under that agreement, (*see* Compl. Ex. A. ¶ 5.6). [7]

{86}    North Carolina courts generally will honor a contractual choice of law provision unless either:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice,
>
> or
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of applicable law in the absence of an effective choice of law by the parties.

---

[7] In ruling on Classic Coffee's Motion to Dismiss, the Court considered only the facts alleged in the Answer and Counterclaims.  Because, however, Anderson references the Stockholders Agreement, Employment Agreement, and Guaranty Agreement in his counterclaims, and these documents are in the Court file, I may consider them without converting Classic Coffee's Motion to Dismiss into a Motion for Summary Judgment.  *See Eastway Wrecker Serv., Inc. v. City of Charlotte*, 165 N.C. App. 639, 641-42, 599 S.E.2d 410, 411-12 (2004); *Oberlin Capital* at 60-61, 554 S.E.2d at 847; *Robertson v. Boyd*, 88 N.C. App. 437, 440-41, 363 S.E.2d 672, 675 (1988).

*Cable Tel Servs., Inc. v. Overland Contracting, Inc.*, 154 N.C. App. 639, 643, 574 S.E.2d 31, 33-34 (2002).

{87}   In this case, although Classic Coffee is a Delaware corporation, (Compl. ¶ 1; Answer and Countercls. ¶¶ 1, 27), North Carolina has a substantial relationship to the dispute because Classic Coffee maintains its headquarters here, (Compl. ¶ 1; Answer and Countercls. ¶ 1), and Anderson is a citizen of this state (Compl. ¶ 2; Answer and Countercls. ¶ 2).  Thus, nothing else appearing, the Court would honor the parties' choice of North Carolina substantive law to resolve Anderson's claim of unconscionability, including any relevant provisions of the North Carolina Business Corporation Act that would not otherwise apply in the case of a foreign corporation. *See, e.g., Yates v. Bridge Trading Co.*, 844 S.W.2d 56, 62 (Mo. Ct. App. 1992) (stating that parties to a stock purchase agreement involving a Delaware corporation could "choose to have their agreement governed by the sections of the General and Business Corporation Law of Missouri by an express choice of law provision.").

{88}   The roadblock to such a result in this case, however, is the "internal affairs doctrine," which holds that the law of the incorporating state should normally be applied to matters involving the internal affairs of a foreign corporation.  *See, e.g., McDermott, Inc. v. Lewis*, 531 A.2d 206 (Del. 1987).  Under the "internal affairs doctrine," some courts have declined to give effect to a contractual choice of law provision that seeks to trump the law of the incorporating state in matters involving the internal affairs of a foreign corporation.  *See, e.g., BBS Norwalk One, Inc. v. Raccolta, Inc.*, 60 F. Supp. 2d 123 (S.D.N.Y. 1999); *Clark v. Kelly*, 1999 Del. Ch. LEXIS 148, Del. Ch. C.A. No. 16780, Jacobs, V.C. (June 24, 1999); *Newell Co. v. Peterson*, 325 Ill. App. 3d 661, 758 N.E.2d 903 (2001).  According to the preeminent treatise on North Carolina corporate law, "[t]he "internal affairs" of a corporation [include] such matters as . . . the sale or

21

redemption by the corporation of its shares or other securities . . . ."  Russell M. Robinson, II,

*Robinson on North Carolina Corporation Law* § 32.05 n.1 (7th ed. 2002).

{89}   As stated earlier, the parties do not address the choice of law issue relating to Anderson's

unconscionability claim and simply assume the application of North Carolina law.  (*See* Answer

and Countercls. ¶¶ 65-67; Mem. in Supp. of Mot. to Dismiss Countercls. 4-7; Resp. to Mot. to

Dismiss 4-6; Reply Mem. in Supp. of Mot. to Dismiss Countercls. 4-6.)  Several North Carolina

cases hold that a trial court may proceed on the parties' assumption without any analysis as to

choice of law.  *E.g., First Union Nat'l Bank v. Brown*, 166 N.C. App. 519, 526-27, 603 S.E.2d

808 (2004) (citing *Tenn. Carolina Transp., Inc. v. Strick Corp.*, 283 N.C. 423, 431, 196 S.E.2d

711, 716 (1979)) (deciding whether officer of Delaware corporation had authority to bind

Delaware corporation to a guaranty under North Carolina law because both parties to dispute

assumed the applicability of North Carolina law to the issue).  Given the importance of the

"internal affairs doctrine" to the consistent application of the corporate law of this State and

other states, however, the Court would normally decline to accept the parties' assumption and

resolve the choice of law issue on its merits.

{90}   The Court need not do so here, however, because Anderson's unconscionability claim

fails under both North Carolina and Delaware law.

{91}   Turning first to North Carolina law, N.C.G.S. § 55-6-27(b) provides that a "restriction on

the transfer . . . of shares is valid and enforceable against the holder or a transferee of the holder

if the restriction is authorized by this section, [and] it is not unconscionable under the

circumstances."  N.C.G.S. § 55-6-27(b) (2006).[8]

---

[8] As was the case here, a restriction on transfer of shares may include a requirement that the stockholder offer to sell, and the corporation agree to buy, the restricted shares.  N.C.G.S. § 55-6-27(d)(1)-(2) (2006).

{92}    The North Carolina Commentary to N.C.G.S. § 55-6-27 explains that the language

regarding unconscionability was added to the Model Business Corporation Act ("Model Act") to:

> address[] a concern that the Model Act's section 6.27 may allow the enforcement
> of unconscionable restrictions.  The drafters noted that the Model Act's language
> in section 6.27 may not allow judicial discretion in a situation where there was
> initially a reasonable purpose in imposing a restriction but over time the effect of
> the restriction had become unreasonable because of a change in circumstances.

N.C.G.S. § 55-6-27, N.C. cmt. (2006).

{93}    Since Anderson does not allege that the Stockholders Agreement was unconscionable at

the time of its execution, (*see* Answer and Countercls. ¶¶ 65-67), the Court's inquiry here is

whether Anderson has alleged facts showing a change in circumstances that renders the

Stockholders Agreement unconscionable.

{94}    An examination of Anderson's Answer and Counterclaims reveals that Anderson, despite

his assertion in paragraph 66, fails to allege any facts showing such a change in circumstances.

{95}    Anderson argues that the Stockholders Agreement has been rendered unconscionable by

three changes in circumstances.  (Resp. to Mot. to Dismiss 5-6.)  First, Anderson argues that the

Stockholders Agreement was rendered unconscionable because it assumed the establishment of

an ESOP that would determine the fair market value of Classic Coffee's stock.  (Resp. to Mot. to

Dismiss 5.)  Next, Anderson argues that the Stockholders Agreement was rendered

unconscionable because Anderson, who was terminated by Classic Coffee on 22 July 2003,

(Answer and Countercls. ¶ 39), believed, at the time the Stockholders Agreement was executed,

"that he would be involved with [Classic Coffee's] management" and that "he would be

employed by [Classic Coffee] until retirement," (Resp. to Mot. to Dismiss 5).  Finally, Anderson

argues that the Stockholders Agreement has been rendered unconscionable because the Guaranty

Agreement remained in effect after his termination. (Resp. to Mot. to Dismiss 5-6.) The Court addresses these contentions in turn.

{96} In North Carolina, an agreement is unconscionable when:

> the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other . . . If the provisions are then viewed as so one-sided that the contracting party is denied any opportunity for a meaningful choice, the contract should be found unconscionable.

*Brenner v. The Little Red Sch. House, Ltd.*, 302 N.C. 207, 213, 274 S.E.2d 206, 210 (1981) (citations omitted).

{97} Anderson does not state, and the Court cannot determine, how the fact that the ESOP was not established under the terms of the Stockholders Agreement renders the terms of the Stockholders Agreement "oppressive." This fact, if true, might establish a breach of the Stockholders Agreement, but the breach of one term of a contract does not, by itself, render the other terms of the contract "oppressive." Further, any claim relating to the fact that the ESOP was not established under the terms of the Stockholders Agreement can be addressed under Anderson's First Cause of Action, which alleges breach of contract.

{98} Nor does the fact that Classic Coffee terminated Anderson's employment despite Anderson's belief that he would be involved with Classic Coffee's management and employed by Classic Coffee until retirement constitute a change in circumstances rendering the Stockholders Agreement unconscionable.

{99} Again, Anderson does not state, and the Court cannot determine, how the realization of circumstances specifically provided for in the Stockholders Agreement and the Employment Agreement, (*see* Compl. Ex. A ¶¶ 3.1-3.4; Mem. in Supp. of Mot. to Disqualify Ex. D ¶¶ 1.5(b), 1.6(d)), constitutes a change in circumstances rendering the terms of the Stockholders Agreement

24

unconscionable.  To the contrary, Anderson's belief flies in the face of the relevant documents, which specifically contemplate that Anderson could be terminated prematurely and provide procedures for redeeming his stock under such circumstances.

{100}  Finally, the fact that the Guaranty Agreement remains in effect after Anderson's termination is not a change in circumstances.

{101}  Anderson executed the Guaranty Agreement at the same time he entered into the Stockholders Agreement.  (Answer and Countercls. ¶ 53.)  The continuing existence of the Guaranty Agreement, therefore, is not a change of circumstances, but rather a continuation of the same circumstances that existed when Anderson signed the Stockholders Agreement.

{102}  Since Anderson does not allege that the Stockholders Agreement was unconscionable at the time of its execution, (*see* Answer and Countercls. ¶¶ 65-67), and has not alleged facts showing a change in circumstances that renders the Stockholders Agreement unconscionable, Anderson's Answer and Counterclaims fails to state an unconscionability claim under North Carolina law.

{103}  Turning next to Delaware law, Del. Code Ann, tit. 8, § 202 provides that:

> A restriction on the transfer . . . of securities of a corporation . . . is permitted by
> this section if it:
>> (1) Obligates the holder of the restricted securities to offer to the
>> corporation or to any other holders of securities of the corporation . . . a
>> prior opportunity . . . to acquire the restricted securities; or
>> (2) Obligates the corporation or any holder of securities of the corporation
>> . . . to purchase the securities which are the subject of an agreement
>> respecting the purchase and sale of the restricted securities . . . .

Del. Code Ann. tit. 8, § 202 (2006).

{104}  The Stockholders Agreement, which obligates Anderson to sell and Classic Coffee to purchase Anderson's stock, (*see* Compl. Ex. A ¶ 3.1(b)), is permitted under Del. Code Ann, tit.

8, § 202(1) and § 202(2). Notably, this statute, unlike N.C.G.S. § 55-6-27, does not contain an exception for unconscionable agreements.

{105} However, as the Delaware Chancery Court has long held, "parties are at liberty to stipulate upon the contract's terms [but] if the terms are unconscionable, no court of equity would assist in enforcing them." *Lawson v. Houshold Fin. Corp.*, 17 Del. Ch. 1, 11, 147 A. 312, 316 (1929). Thus, the Court must determine whether the Stockholders Agreement is unconscionable under Delaware common law.

{106} In Delaware, a contract is unconscionable if, it is "such as no man in his senses and not under delusion would make on the one hand, and as no honest or fair man would accept, on the other." *Progressive Int'l Corp. v. E.I. Du Pont De Nemours & Co.*, 2002 Del. Ch. LEXIS 91, *47 n.45, Del. Ch. C.A. No. 19209, Strine, V.C. (July 9, 2002) (citing *Tulowitski v. Atl. Richfield Co.*, 396 A.2d 956, 960 (Del. 1978)).

{107} Delaware's test for unconscionability is substantially the same as North Carolina's test. *Compare Progressive* at *47 n.45, *with Brenner* at 213, 274 S.E.2d at 210. Consequently, the fact that Anderson does not allege that the Stockholders Agreement was unconscionable at the time of its execution, (*see* Answer and Countercls. ¶¶ 65-67), coupled with the fact that Anderson, as discussed earlier, has not alleged facts showing a change in circumstances that renders the Stockholders Agreement unconscionable, means that Anderson's Answer and Counterclaims also fails to state an unconscionability claim under Delaware law.

{108} In sum, Anderson has not alleged any set of facts showing that the Stockholders Agreement is unconscionable under either North Carolina or Delaware law. Because Anderson's Second Cause of Action fails to state a claim upon which relief can be granted, the Court **GRANTS** Classic Coffee's Motion to Dismiss as to this claim.

26

## 2.

## JUDICIAL DISSOLUTION

{109} Anderson's Answer and Counterclaims also alleges that Classic Coffee should be dissolved pursuant to N.C.G.S. § 55-14-30 because Anderson, as a minority stockholder of Classic Coffee, had a reasonable expectation of long-term employment and meaningful participation in the management of Classic Coffee and this expectation was frustrated when Classic Coffee terminated his employment. (Answer and Countercls. ¶¶ 71-75.)

{110} N.C.G.S. § 55-14-30 provides that a "superior court may dissolve *a corporation . . .* [i]n a proceeding by a shareholder if it is established that . . . liquidation is reasonably necessary for the protection of the rights or interests of the complaining shareholder." N.C.G.S. § 55-14-30 (2006) (emphasis added).

{111} N.C.G.S. § 55-1-40 defines a corporation as "a corporation for profit or a corporation having capital stock that is incorporated under or subject to the provisions of this Chapter *and that is not a foreign corporation . . . .*" N.C.G.S. § 55-1-40(4) (2006) (emphasis added).

{112} Anderson admits that Classic Coffee is a Delaware corporation. (Answer and Countercls. ¶¶ 1, 27.) As a foreign corporation, Classic Coffee is explicitly excluded from the definition of "corporation" in N.C.G.S. § 55-14-40 and, consequently, outside the ambit of N.C.G.S. § 55-14-30.

{113} Even though Anderson's judicial dissolution claim arguably is related to the terms of his Employment Agreement, (*see* Answer and Countercls. ¶¶ 71-75), and the Employment Agreement is governed by a North Carolina choice of law provision, (Mem. in Supp of Mot. to Disqualify Ex. D ¶ 3.7), a provision that, as discussed earlier, is generally valid in North Carolina, the Court declines to apply it to Anderson's claim for judicial dissolution.

{114}  Instead, because a claim for judicial dissolution goes to the very core of a corporation's internal affairs, it is properly governed by the law of the state of incorporation, in this case, the law of Delaware.  *See Johnson v. Johnson*, 272 Neb. 263, 720 N.W.2d 20 (2006) (holding that dissolution, and any remedy like dissolution, is properly governed by the law of the state of incorporation).

{115}  Since Classic Coffee is outside the ambit of N.C.G.S. § 55-14-30, the Court lacks the authority to order Classic Coffee's dissolution pursuant to that statute.  As a result, Anderson's Answer and Counterclaims alleges facts that defeat his claim for judicial dissolution, and, therefore, this claim must be dismissed under Rule 12(b)(6).  *See Oberlin Capital* at 56, 554 S.E.2d at 844 (citing *Hudson Cole Dev. Corp. v. Beemer*, 132 N.C. App. 341, 345-46, 511 S.E.2d 309, 312 (1999)).

{116}  Further, even if the Court could dissolve Classic Coffee under North Carolina law, either pursuant to N.C.G.S. § 55-14-30 or as a matter of equity, Anderson has failed to plead a sufficient factual basis for doing so here.

{117}  N.C.G.S. § 55-14-30 provides that a "superior court may dissolve a corporation . . . [i]n a proceeding by a shareholder if it is established that . . . liquidation is reasonably necessary for the protection of the rights or interests of the complaining shareholder."  N.C.G.S. § 55-14-30 (2006).

{118}  A "complaining shareholder's 'rights or interests' in a close corporation include the 'reasonable expectations' the complaining shareholder has in the corporation."  *Meiselman v. Meiselman*, 309 N.C. 279, 298, 307 S.E.2d 551, 563 (1983).

{119}  To obtain relief under the "reasonable expectations" analysis, a complaining stockholder must prove that: (a) he had one or more reasonable expectations known or assumed by the other

28

stockholders; (b) the expectation has been frustrated; (c) the frustration was without fault of the complaining stockholder and was, in large part, beyond his control; and (d) under all of the circumstances of the case, the complaining stockholder is entitled to some form of equitable relief. *Id.* at 301, 307 S.E.2d at 564.

{120} In order for a complaining stockholder's expectations to "be reasonable, they must be known to or assumed by the other shareholders and concurred in by them. Privately held expectations which are not made known to the other participants are not 'reasonable.' Only expectations embodied in understandings . . . among the participants should be recognized by the court." *Meiselman*, 309 N.C. at 298, 307 S.E.2d at 563.

{121} Anderson has failed to plead a sufficient factual basis for ordering the dissolution of Classic Coffee because his expectation of long-term employment and meaningful participation in the management of Classic Coffee is not "reasonable" given that it is flatly contradicted by the express terms of both the Stockholders Agreement and Anderson's Employment Agreement.

{122} Here, Article III of the Stockholders Agreement provides for the disposition of Classic Coffee stock in the event any of Classic Coffee's stockholders are terminated. (*See* Compl. Ex. A ¶¶ 3.1-3.4.) Specifically, the Stockholders Agreement provides for the disposition of Anderson's stock if his employment is terminated "without Cause." (*See* Compl. Ex. A ¶ 3.1(b).) Furthermore, Anderson's Employment Agreement provided only for an initial 12-month term of employment, and its terms describe at length the consequences resulting from the termination of Anderson's employment "without Cause." (*See* Mem. in Supp. of Mot. to Disqualify Ex. D ¶¶ 1.5(b), 1.6(d).)

{123} Since the Stockholders Agreement and Anderson's Employment Agreement clearly contemplated the termination of Anderson's employment "without Cause," Anderson's

expectation of long-term employment and meaningful participation in the management of Classic Coffee, the only expectation upon which Anderson bases his claim for judicial dissolution, is not reasonable.

{124} The only other basis the Court could properly consider for dissolving Classic Coffee would be where Brinson and Bailey, Classic Coffee's other stockholders, prevented Anderson from selling his stock. *See Royals v. Piedmont Elec. Repair Co.*, 137 N.C. App 700, 529 S.E.2d 515 (2000) (upholding dissolution of a closely-held corporation where the closely-held corporation "demonstrated no interest in offering a fair return for [the] shares" of a minority shareholder who had been barred from any participation in the corporation). While Anderson alleges that he has been prevented from selling his stock to a third party, (Answer and Countercls. ¶¶ 48-49), the real dispute in this case centers on the price that Classic Coffee should be required to pay to redeem Anderson's stock. Because the pleadings in this case frame this issue fully without the need to consider judicial dissolution of Classic Coffee, Anderson has failed to plead a sufficient basis for granting such equitable relief.

{125} In sum, the Court concludes that it does not have the authority to dissolve Classic Coffee, a foreign corporation, pursuant to N.C.G.S. § 55-14-30. In any event, Anderson has failed to plead a sufficient factual basis for ordering the dissolution of Classic Coffee under North Carolina law because he does not allege the frustration of any *reasonable* expectation with respect to his interests as a shareholder in Classic Coffee. Consequently, the Court **GRANTS** Classic Coffee's Motion to Dismiss as to this claim.

**CONCLUSION**

{126}  Based on the foregoing, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that Defendant's Motion to Disqualify is **DENIED** and Plaintiff's Motion to Dismiss Counterclaims is **GRANTED** as to the Defendant's Second and Fourth Causes of Action.

This the 1st day of December, 2006.